IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BRENDA UMHOLTZ, )
)
          Plaintiff, )
)
vs. ) Case No. 11-4018-JAR
)
STATE OF KANSAS, DEPARTMENT )
OF SOCIAL AND REHABILITATION )
SERVICES, )
)
          Defendant. )
_____)

## MEMORANDUM AND ORDER

On August 16, 2013, the jury returned a verdict in favor of Plaintiff Brenda Umholtz on her retaliation claim under the Rehabilitation Act against Defendant State of Kansas, Department of Social and Rehabilitation Services ("SRS"), where she had worked as an independent contractor providing vocational assessment and placement services. The jury awarded Plaintiff $31,157.64 in lost income for the years 2009 and 2010, and found no damages for lost income for the period 2010 through the date of the verdict. The jury further awarded Plaintiff $20,772.30 in damages for emotional distress, mental anguish, anger, and loss of enjoyment of life. The Court now considers Plaintiff's request for an additional award of prejudgment interest, equitable relief in the form of reinstatement or front pay, and injunctive relief prohibiting further retaliation by SRS. As described more fully below, the Court orders judgment in this case on the verdict and for an additional award of prejudgment interest on the lost income award. The Court denies Plaintiff's remaining requests for equitable relief.

I.      **Prejudgment Interest**

Plaintiff requests prejudgment interest on the lost income award in the amount of 10% per annum, the Kansas statutory rate, from the time the service provider agreement was terminated to the time of the verdict. Defendant does not object to Plaintiff's request for prejudgment interest, but argues that it should be limited to the period March 12, 2009 through June 30, 2009, when her contract expired. Defendant argues that the rate to be applied should be lower than the 10% Kansas statutory rate given the jury's limited lost income award.

Courts are authorized to grant prejudgment interest on a back pay award under Title VII and other discrimination statutes.[1] The Court agrees that an award of prejudgment interest on the lost compensation award is appropriate here because it is analogous to back pay. The Court further exercises its discretion in finding that 10% per annum is an appropriate and reasonable interest rate. While the rate of prejudgment interest on a federal claim is a question of federal law, courts generally look to state law to determine the rate.[2] The Court need not halve the statutory rate in order to give credence to the jury's limited back pay award. The fact that the jury found no damages after 2010 accounts fully for its limited back pay award by limiting the principle amount of the damage award. Defendant relies on *Baty v. Willamette Industries, Inc.*[3] in arguing for a lower interest rate. In *Baty*, Judge Lungstrum focused on the periodic nature of the plaintiff's back pay loss in determining that the full statutory rate should not be applied.[4]

---

[1] *Daniel v. Loveridge*, 32 F.3d 1472, 1478 (10th Cir. 1994) (Title VII); *see Carr v. Ft. Morgan Sch. Dist.*, 4 F. Supp. 2d 989, 996 (D. Colo. 1998) (ADA).

[2] *See Welch v. UNUM Life Ins. Co. of Am.*, No. 00-1439-WEB, 2008 WL 3876319, at *1–2 (D. Kan. Aug. 18, 2008).

[3] 985 F. Sup. 987 (D. Kan. 1997).

[4] *Id.* at 999.

2

The court reasoned that because the plaintiff had not lost her entire back pay award on the date of termination, but instead, suffered a back pay loss that aggregated over time, the full statutory interest rate would overcompensate her.[5] Here, the jury's back pay award was limited to a relatively short period of time, 2009 and 2010. Based on the jury's verdict, from sometime in 2010 until the date of judgment, Plaintiff was due the entire back pay award. Under these circumstances, the Court does not find that a reduction in the statutory rate of prejudgment interest is warranted and will apply the 10% Kansas statutory rate.

The Court further finds that the period of prejudgment interest should run from the date the contract was terminated until the date of judgment. Prejudgment interest is intended to prevent the Defendant from essentially taking an interest free loan on Plaintiff's wages. That interest free loan continued past the date that the contract terminated and continued through the date of judgment.

## II. Reinstatement and Front Pay

Plaintiff requests reinstatement and front pay between the period of judgment and reinstatement. "'[F]ront pay is simply money awarded for lost compensation during the period between judgment and reinstatement or in lieu of reinstatement.'"[6] Front pay is an equitable appropriate remedy under the Rehabilitation Act.[7] Reinstatement is the preferred remedy, but it is not always a viable option.[8] The Tenth Circuit has explained that when "'reinstatement is not

---

[5]*Id.*

[6]*Abuan v. Level 3 Commcn's, Inc*. 353 F.3d 1158, 1176 (10th Cir. 2003) (quoting *Pollard v. E.I. du Pont de Nemours & Co.*, 532 U.S. 843, 846 (2001)).

[7]*See Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 964 (10th Cir. 2002).

[8]*Abuan*, 353 F.3d at 1176.

3

viable because of continuing hostility between the plaintiff and the employer or its workers, or because of psychological injuries suffered by the plaintiff as a result of the discrimination, courts have ordered front pay as a substitute for reinstatement.'"[9] "In such cases an award of front pay as a substitute for reinstatement is 'a necessary part of the make whole relief mandated by Congress.'"[10] Front pay is only appropriate however "when the other damages awarded will not fully compensate the plaintiff for [her] injury."[11] The Court "must attempt to make the plaintiff whole, yet the court must avoid granting the plaintiff a windfall."[12]

Plaintiff seeks both reinstatement and front pay, or if reinstatement is not found to be viable, front pay only. Defendant argues that Plaintiff is entitled to neither reinstatement nor front pay. The Court denies Plaintiff's request for both reinstatement and front pay. The law is clear that front pay is only awarded in the event that reinstatement is not a viable option unless it is awarded for the period between termination and reinstatement. While the Court is cognizant that the facts of this case are different than typical retaliation cases because Plaintiff served as an independent contractor rather than an employee, the Court declines to give Plaintiff a windfall by ordering both reinstatement and front pay when the law clearly views them as mutually exclusive remedies to the extent they cover the same time period. Therefore the Court turns to whether reinstatement is a viable option.

### A. Reinstatement

---

[9]*Id.* (quoting *Pollard*, 532 U.S. at 846).

[10]*Id.* (quoting *Pollard*, 532 U.S. at 850).

[11]*Hudson v. Chertoff*, 473 F. Supp. 2d 1292, 1302 (S.D. Fla. 2007) (quoting *Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1529 (11th Cir. 1991)).

[12]*Goico v. Boeing Co.*, 347 F. Supp. 2d 986, 991 (D. Kan. 2004) (quotation omitted).

4

Plaintiff argued at the damages hearing that she should be reinstated for a period of three years, the length of her original contract with SRS. Her counsel argued that there was no evidence of substantial hostility between her and her co-workers and supervisors. Defendant argued that reinstatement was not a viable option. The Court agrees that the evidence in this case, both at trial and at the damages hearing, shows that hostility between Plaintiff and the SRS employees prevents reinstatement of her provider contract from being a viable option. Plaintiff implicitly acknowledges this by requesting both front pay and reinstatement—she argues that front pay is necessary because of the unease and unfamiliarity between herself and the vocational counselors at SRS who she would depend on for her referrals. She asks for front pay in an amount equivalent to a three-year contract in order to compensate for the lag in referrals that would necessarily stem from the lack of familiarity and unease between the counselors and Plaintiff. Plaintiff testified it would take her six years to get to her 2008 reference and income levels. Plaintiff's position that the Court would be required to order front pay in addition to reinstatement in order to make her whole is clear evidence that reinstatement is not a viable option.

Plaintiff herself testified that while she would like to make reinstatement work, there could be animosity because the SRS counselors are aware of her lawsuit and saw some of the evidence presented at trial. Plaintiff testified that she was not confident she would receive referrals from caseworkers who had received reprimands for working with her in the past. She further testified that there could be retaliation against her or others who chose to send her referrals. Indeed, Plaintiff believes an injunction is warranted prohibiting future retaliation in the event that Plaintiff is reinstated. The Court finds that reinstatement is not a viable option here.

As such, the request for injunctive relief is moot.

**B.	Front Pay**

The Court now turns to whether front pay is required in order to make Plaintiff whole. The amount of front pay, if any, is within the Court's discretion.[13] In determining whether front pay is warranted, and if so, how much, the Court is to consider the following factors:

> work life expectancy, salary and benefits at the time of termination, any potential increase in salary through regular promotions and cost of living adjustment, the reasonable availability of other work opportunities, the period within which the plaintiff may become re-employed with reasonable efforts, and methods to discount any award to net present value.
>
> In formulating a front-pay award the district court may consider all evidence presented at trial concerning the individualized circumstances of both the employee and employer, but it must avoid granting the plaintiff a windfall.[14]

The Court has considered the evidence presented at trial and at the hearing and finds that other damages awarded in this case have made Plaintiff whole, and that a further award of front pay would be entirely speculative.

First, the Court is limited by the jury's finding that Plaintiff was not entitled to any damages for lost compensation after the year 2010. "[W]hen legal and equitable issues to be decided in the same case depend on common determinations of fact, such questions of fact are submitted to the jury, and the court in resolving the equitable issues is then bound by the jury's findings on them."[15] The jury determined that Plaintiff only suffered loss of income due to

---

[13]*McInnis v. Fairfield Communities, Inc.*, 458 F.3d 1129, 1145 (10th Cir. 2006).

[14]*Whittington v. Nordam Grp. Inc.*, 429 F.3d 986, 1000–01 (10th Cir. 2005).

[15]*Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 964 (10th Cir. 2002).

6

retaliation in 2009 and 2010 and explicitly found no lost compensation after 2010. The jury made a factual determination that Plaintiff suffered no damage after this period of time and the Court will not ignore that factual determination and award Plaintiff a windfall by finding she lost income during a period of time after which the jury determined no damages were incurred.

The Court also finds that Plaintiff's request for prospective damages is unduly speculative. Defendant urges that Plaintiff must show an amount of lost future compensation with reasonable certainty—the standard that applies to determinations of lost profits damages calculations.[16] The Court is mindful however that "determining a front pay award requires the district court to predict future events and consider many complicated and interlocking factors,"[17] which necessarily makes a future damages calculation difficult. And "'the mere fact that damages may be difficult of computation should not exonerate a wrongdoer from liability. The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created.'"[18]

Plaintiff's request for prospective damages asks the Court to assume that her 2008 receipts from the State, approximately $62,000, would have continued had her contract not been terminated. Unlike most front pay cases where the Court can extrapolate an award based on an employee's salary, Plaintiff's contract did not guarantee any income from SRS. Indeed, the evidence showed the Plaintiff's income from her SRS contract grew over the course of her 2006 contract term and Mike Donnelly testified that the providers' incomes were not

---

[16]*See, e.g.*, *Kelley Metal Trading Co. v. Al-Jon/United, Inc.*, 877 F. Supp. 1478, 1484 (D. Kan. 1995) (discussing lost profits standard under Kansas law).

[17]*Abuan v. Level 3 Commcn's, Inc*. 353 F.3d 1158, 1177 (10th Cir. 2003) (quotation omitted).

[18]*Id.* at 1180 (quoting *EEOC v. Prudential Sav. & Loan Assn'n*, 753 F.2d 1166, 1173 (10th Cir. 1985)).

7

predictable—they varied up and down depending on the services needed at any particular time. Plaintiff's service provider agreement with SRS was for a three-year period; it was terminated with almost four months remaining on the contract term. The contract did not automatically renew. Although Paul Meals testified that over 80% of service provider agreements are renewed after their terms expire, only four of the eleven vocational assessment providers with whom the Wichita SRS office had service provider contracts in 2008 still had a contract with SRS in 2013.

Even assuming Plaintiff would have renewed her service provider agreement two more times, it is undisputed that the agreement would not guarantee her a fixed income. Her referrals, and therefore her income, were dependent on the SRS counselors referring cases to her for vocational assessments. It was also dependent on the universe of SRS referrals being large enough to maintain her 2008 income.

Importantly, economic conditions shifted after 2008, calling into question Plaintiff's ability to sustain her 2008 levels of income had her contract not been terminated. In the years after Plaintiff's contract was terminated, the referrals to vocational service providers decreased: in 2009 only between $12,000 and $13,000 was paid out for all vocational assessments, and in 2010, there were only nine total referrals with a total pay out of $3800 for vocational assessments.[19] These figures are far below the $62,000 Plaintiff made from her SRS contract in 2008, which she asks the Court to use as a benchmark. Donnelly further testified that SRS has retained a consulting firm to evaluate whether the provider agreements under which Plaintiff

---

[19]Plaintiff testified that her income on the 2006 contract was from both vocational assessments and placements. She testified at the trial of her co-Plaintiff Tina Bruce that she contacted Meals in the fall of 2008 and told him she would no longer perform vocational placements. At that time, she believed her other work was a priority and the changing labor market was making placements more difficult. She advised Meals that she might pick the placements back up "later." Doc. 162-1 at 16–17.

operated should continue. He indicated that an assessment is forthcoming in May 2014, at which point external vocational assessments may cease altogether in favor or strictly internal vocational assessments. Given this potential outcome, it is entirely speculative to assume that Plaintiff's contract would have been renewed for the length of time she requests, and that she would have received referrals that generated an amount approximating her 2008 income from SRS.

**IT IS THEREFORE ORDERED BY THE COURT** that judgment in favor of Plaintiff on her Rehabilitation Act claim be entered in this case as follows: $31,157.64 in lost income for the years 2009 and 2010, plus prejudgment interest that shall run from the date of contract termination to the date of judgment, and $20,772.30 in damages for emotional distress, mental anguish, anger, and loss of enjoyment of life, plus costs.

**IT IS SO ORDERED.**

Dated: October 28, 2013

                                                 S/ Julie A. Robinson
                                                 JULIE A. ROBINSON
                                                 UNITED STATES DISTRICT JUDGE